I represent Michael Dehamm, the defendant appellant in this case, who is present in the courtroom in the gray suit on your far right. Your Honors, there's a number of issues in this case. I think I would like to begin with the illegal search issue, unless anybody has any particular areas they would like to review the case law in determining whether or not reasonable suspicion is required, and in this case, I think it is required in all cases, and secondly, I think there was no reasonable suspicion in this particular case. If I can just backtrack one second, I would like to reserve five minutes for rebuttal. The Supreme Court in the City of Indianapolis v. Edmond stated that it has never approved of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing, and I think that's a good starting point for these cases. We also have the Kincaid case, which authorizes DNA searches now of federal probationers and supervised releases. The government is probably correct in that it's the analysis of these cases as to whether there is an appropriate search or not depends on the totality of the circumstances. The U.S. Supreme Court has confirmed that many times in Knights and Griffin and all of these cases. The question is... In this particular case, well, first of all, I'd refer to the Judge Miller's ruling. He indicated that reasonable suspicion is not needed. He believes that California Supreme Court law is ruling in this case, and he also indicated that the reliability of the informant in this case was not an issue. All that was an issue in his mind was whether the officers who conducted the search could reasonably have concluded that a particular confidential informant could be reliable. Now, that was at page 176, pages 176 through 179 of the excerpt of record. If we take a different approach, counsel, we're reviewing this de novo. If we take a different approach than the judge, we're reviewing the facts in the record. In this particular case, you're supposed to look, according to United States v. Fernandez-Castillo, you're to look at the reliability and credibility of the source of the information. You're supposed to look at the temporality issue in terms of when the information was received by the officers, and you are supposed to determine whether or not there was a situation where we have no idea exactly what the credibility of this informant is. This informant was in custodial status the morning of Mr. DeHomme's actual arrest. He had plenty of incentive to lie or to talk or incriminate somebody else in order to get out. We weren't allowed to follow up on that as part of the defense questioning whether he or she was going to be released as a result of his information. This discretion is not a very onerous standard. It's never been a very onerous standard. It's a little more than a smidgen. And here, what you are arguing, it really sounds to me like you're arguing probable cause. And maybe you might have unique corroboration, this or that. But this is a probation lawyer. He signed away most of his Fourth Amendment rights. And all that's needed, again, by hypothesis, assuming that we agree with you, that you need reasonable suspicion. All you need is reasonable suspicion. Enough to make the police suspect. It doesn't have to be conclusive. It doesn't have to be more than likely than not. Fairly weak standard. Always has been. I agree with you. I think you're going to have a very difficult time showing that when you've got an informant, that the police have had prior good luck with the informant, and he gives some very specific indication of a crime, that that doesn't amount to reasonable suspicion. I just don't see where you're going with this. Okay. Castile-Puente, the case I cited, is a reasonable suspicion case. It's not a probable cause case. And they do say, had they, the officers who stopped the car in that case just relied on the transportation report alone that the car was driving erratically, that would not suffice as reasonable suspicion. Well, this is hypothetical holding, huh? That wasn't hypothetical. Have they done this? You know, courts say that all the time, but it's not a holding. But they rely on the three factors, the reliability and credibility of the source of the information, the temporality and the independent corroboration. I don't think we can ignore the standards we're supposed to review, to look at, in terms of determining if there was reasonable suspicion. Here, the reliability of the informant has been, we've been told it's good. The credibility, we don't know. Even one of the officers admitted that this particular informant had some kind of a fraud offense on his record, but we weren't allowed to get into that. We weren't allowed to get into his motive to lie, whether he'd be released on bail, if he coughed up information about Mr. DeHaan. We know nothing about his credibility. Counsel, what's your case authority for the proposition that in the reasonable suspicion context, you are permitted to explore all of that? I said it in my reply brief, United States v. Fernandez-Castillo. So that case stands for the proposition that in the determination of reasonable suspicion, you are allowed to engage into the type of inquiry that you're telling us was not done? I think if ‑‑ Would you answer that question? Okay. I'm sorry. Can you repeat it, Your Honor? My question was whether or not Fernandez-Castillo supports the proposition that in a reasonable suspicion context, you are permitted to engage in the type of inquiry that you are postulating to us now? I thought I did. I could be wrong, but I thought I did. Could you point to the language that you're relying upon to support your assertion? If I refer to my reply brief at page ‑‑ Well, not the brief. I'm talking about the language in the case. That's where I think I cited it, Your Honor. Maybe I just summarized it, but I don't ‑‑ Is this Fernandez-Castillo? Page 16 of my reply brief. This court found reasonable suspicion where a state transportation officer, i.e., a known unbiased source contemporaneously made a report about a car driving erratically as the source was relaying the information. This report and its information were relayed to a police officer who discovered the car within minutes and corroborated the report and saw the car driving erratically. I don't have that in quotes. Do you not have my reply brief? I'm a little worried about that. We have the brief, but I asked you for the language from the case that you're relying upon. I don't have the exact language in front of me, Your Honor. I'm sorry. We do not hold that the ‑‑ I do quote this in terms of the independent corroboration factor. We do not hold that the MDOT report standing alone provided Officer Schock with reasonable suspicion to stop the car absent Officer Schock's own corroborating observations. That was a document. There they were talking about a document report. We're talking about here a live informant. So I'm just curious as to how you extrapolated from that your argument that you weren't allowed to delve into the motive to fabricate and the credibility of the informant vis‑a‑vis convictions. That was my question to you. Where do you get the authority that that was part of the reasonable suspicion inquiry? And where did I come up with that? In my mind, if something is a reasonable basis to be suspicious of something, it needs to be reliable. Well, I'm asking you what case authority supports that view in your mind. I thought United States v. Fernandez-Castillo did that. When you say you weren't allowed to look into it, we're talking about the suppression hearing, I assume. Yes, we were in a suppression hearing. I did not push the issue of having the informant reveal his name or her name, identity. But I did ask about whether there was drug use or whether or not the agents had looked at his rap sheet. One of them had indicated that he thought he'd had a prior fraud offense, and that was it. And it's my failure for not asking the name of the informant, I believe, because I think had I done that, I could have done my own independent investigation of who the informant was and what his or her reliability was. Of course, I suppose the issue, I mean, I would think the inquiry is what was known to the agents at the time. I mean, you might find things that were not known to the agents that made this informant wholly so unreliable that they can just dismiss his tip. Well, without the identity being revealed and without his credibility being revealed and without any independent corroboration of the scene of the crime or that it actually occurred like the informant was saying, I think all those together make this unreasonable. I don't think there was any reason, it wasn't reasonable to say, okay, you can have an unidentified informant who's probably got a fraud conviction and we won't tell you about his propensity for drug use or his custodial status or whether he's bargaining to bail out of jail this morning in return for revealing Mr. Daham. I wasn't allowed to get into any of that. Plus, none of this was corroborated. Everything they found in the house once they did the search was exactly what Agent Latulip had said the informant had told him about. It's not independent corroboration. It's not like he's going out to look at where the house is or people coming in and out of there with paper bags. Nobody did any independent corroboration that this was actually occurring. I don't believe you can use the fruits of the search as your corroboration to establish the facts facing the cause to go in and search. Why not? It's not independent corroboration. It's just determining after the fact, oh, the informant was right, it is there. What case authority requires independent corroboration for reasonable suspicion? That is in my opening brief, which I do not have right in front of me. But I don't – that's generally, I believe, the cases I cited are with regard to probable cause. Well, I'm sure that the question is whether the officers had a reasonable suspicion at the time they initiated the search. I mean, that's the issue, not what was found later. Was it reasonable? Let's say they had somebody in the jail cell that morning who had just been arrested and is in a lot of trouble. And maybe he or she – I don't know. I don't know. But I think it was incumbent upon the officers to make sure he was credible. And they did say he'd been reliable two times in the past. On the other hand, he was, at the time, an inactive informant, and he did have fraud on his record, and we don't know what his motives were, but we can guess his motive was to get out of jail. So it's not quite reasonable to me. It's one thing to say somebody's in jail, under charges, and that gives them an incentive to lie. Let's say, oh, the defendant confessed to me. He was in the cell next door to me and so on. Then he could fabricate something. But when you're telling the police, look, if you go here, you're going to find something, the chance is that that's a fabricate. What's the point in fabricating to initiate a search if it isn't going to find anything? I agree with you. You just get them mad at you. I'm sorry? You just get them mad at you. They set up this whole operation. They go down there. They go through all the trouble. They find nothing. It's likely to make things worse for you, even better. Do you have anything beyond this question of whether there was—because I think we understand this point. Is there anything other than this question of reasonable suspicion? All the dominoes fall if this one does? I'm sorry? All the dominoes fall if this one does? I'm just thinking that myself, Your Honor. I'm thinking of nights where there was reasonable suspicion. In Griffin, there was reasonable suspicion that was basically supported by the section. It's very hard not to find reasonable suspicion. You have to really work at it. Public cause has real teeth, but reasonable suspicion is fairly weak. That's why I think the Fernandez-Castillo case is very interesting. It requires quite a bit. Reliability, credibility, temporality. Unless I misread it, but I don't think I did. I think it requires quite a bit for somebody to make sure somebody's reliable. What they're saying is we've got these things here. What they're doing, they're fighting off a dissent, and they're saying a lot of things that they have. I don't see anything in the case that says all these things are required. What they're doing is saying, well, you know, contrary to what the dissent says, we've got this, we've got this, and we've got this. Maybe when the judge gets more experience writing opinions, he realizes when you write a dissent, what you want to do is say less. That's right, the dissent is absolutely right. We don't have this, we don't have this. So I don't see anything in the case. They do say a lot. They do point out that they've got a lot of things, but I don't see anything in the case that says all those things are required. And in fact, the main thing that the case stands for is that it distinguishes a couple of other cases, Thomas and another case, and they said Morales. And what they say, those cases stand for proposition when you've got an uncorroborated tip, an anonymous tip, not uncorroborated, an anonymous tip. Anonymous tips are different, because they describe those two cases where they get this tip and they follow the car on the highway for 42 miles and nothing happens, and then they stop the car, sure enough, and they say, no, anonymous tips are different. But when you're dealing with something that is, an informant that is, with regard to prior experience, that's different. That's what I get out of the case. And then assuming there is reasonable suspicion, the next question is, there's reasonable suspicion that a crime is occurring, this is a law enforcement case, what is required to allow the police to go in? Well, we know that committing crimes is a violation of parole or probation or whatever they were on, he was on, and so they had cars to go to his house and see, is he violating his parole? And while they're there, they can tie him up and his brother, because it's dangerous to search somebody's house when there are two guys running around, and then they chat with him, they chat with him, ask him things about his probation. Have you been doing bad things? Have you been not doing what the court told you to do? This is what they do. But did he consent to the entry and to the interrogation, and is that required? Were the statements he made to the probation officer admitted at the trial? We did not have a trial. We entered into a conditional plea. I mean, were they, okay. They were not that relevant, right? He says, I have a sneaky suspicion. I have a sneaky suspicion, and the probation officer said, was anybody else involved? And he said, do you see anybody here? And he said, well, was your brother involved? He said, no, he wasn't involved. And even Judge Miller said, these clearly are questions about counterfeiting, because the task force was there simply because they suspected counterfeiting, not because they suspected drug. They asked him if he was doing things that violated his probation. Any of those questions could have elicited an answer, and if you're going to ask him questions about his probation, I don't know how else you would phrase the questions. I mean, I guess you could ask him specific questions, have you been doing drugs, have you been doing alcohol, have you had a gun, have you done this, have you done that. They ask more general questions, like, you know, have you been behaving yourself? Have you been violent, you know, have you been up to no good? He asked if he'd been using drugs, and he said, I had used them a few days before. And then he said, do you know why we're here? I have a sneaky feeling why. Is there anything else, is there anyone else involved? Do you see anybody here? Not my brother, I acted alone. And then the government argued that this was a conversation about drugs, and even the judge said, clearly that's not what they're talking about. That's not how the conversation is going. Look, the information received by the task force doesn't relate to drugs. It relates to counterfeiting. And in light of the fact that it is undisputed government. I don't see it. Judge Miller might have seen it, but I don't see it. They're talking drugs, and they say, do you know why we're here? And he says, I have a sneaky suspicion. Who knows what he's been up to? I mean, he might have been, in addition to washing dollar bills and printing hundred dollar bills, he might also be trafficking in drugs. He might be concealing firearms. He might be committing having sex with children. No matter what, it's an incriminating, it's an interrogation. They say, do you know why we're here? This is the kind of question you ask to get somebody who's got a guilty conscience to tell them. I mean, somebody who's promised the court, promised the court, I'm not going to do any of that stuff. But it was an interrogative. It was an interrogation. Regardless of what crime he was asking about, it was certainly interrogation, and he made many, many incriminating statements. And he was not free to leave. And the government opposed the suppression of those. Yes. They, or at one point they argued, well, they're not relevant, we're not going to use them anyway. But I think that's just a roundabout way of getting out of the argument that those initial statements that were definitely incriminating, they were interrogative and they were incriminating, the answers were, they were so close in time, right behind the actual Mirandize conversation that took place three and a half hours later at the Secret Service office, that they are relevant because they tainted the subsequent full-blown confession. Well, it's significant, though, whether, I mean, if the government said we promise not to use them or something, then the issue shifts. Were they involuntary statements? Well, I believe, given the nature of the arrest, they were involuntary. And I believe I argued that as well. Yeah. Well, I understand that. But that, if the government wants to use those statements, and they've got to be more than voluntary, if you're right in saying that this was an interrogation in custody, that then they would have to show that Miranda warnings were given. If they're not going to introduce those statements, or if they don't, if there had been a trial and they don't introduce it, and the argument is that later statements were tainted, you've got to show involuntariness of the person. I would say they were involuntary because... I understand that. Oh, okay. You're way over your time. We'll hear from the government. Okay. Thank you. May it please the Court. I'm David Kernel representing the United States. And with me is my colleague, Christopher Alexander, who will address any sentencing issues, if the Court has any questions on that. And I'm here to talk about the search and also the statements, statement issues. First of all, with regards to whether or not there was reasonable suspicion to support the search, we submit that there was. You have an informant here who apparently has been reliable on two prior occasions. And as you point out, Judge Canby, that he isn't about, in this particular situation, to give the law enforcement officers bogus information, which is going to result in nothing at a search. He was very contemporaneous. It appeared that he had been there, that he had personally seen what was going on. And under the case law, that's all you really need to generate reasonable suspicion. And even under the Fernandez-Castillo case, that this would be more than sufficient because he was a known quantity. He was a known informant. And they could act upon his information as well. In fact, the Court, in ruling on the informant and on whether there was reasonable suspicion, use the totality of the circumstances kind of ruling it, and you find that at ER 179, even to the point where you get to we would submit even under the old Aguilar and Spinelli two-prong test that this informant would have passed that test as well, even getting to a probable cause kind of determination. So in this particular case, we do have reasonable suspicion. That's all you need to have even under the Knights case. And so we submit that the search was valid. But even if we didn't have reasonable suspicion, we don't need it, as we point out at length in our brief. And I'd just like to touch on that very briefly. And that is that there are basically three different ways to look at this. And the first way, as outlined in Knights, is special needs. We, in the Crawford case, as Judge Kozinski will recall, when asked about which of the three theories we'd use, we went for, we opted for special needs. We don't do that in this case. And the reason is, is that that, by doing that, we avoid the Edmonds and Ferguson tests as far as having to show some, that the search was aimed at purposes beyond the general interest in crime control. What we're submitting is that this is a consent kind of a situation, and that grows out of the theories started in the California line of cases, upon which the California law enforcement officers rely. And those cases all rely upon U.S. Supreme Court cases, the Zapp case and the Schneckloff case. In Knights, they use the concept that the consent would be a complete waiver in the Schneckloff sense. And also, as we have pointed out in our brief, in the underlying Knights case, that is the panel case from this Court. You're now arguing they needed nothing at all? They didn't even need the special? That's true. That's what you're arguing. Yes, I am. Yes, I am. But it didn't work for your Crawford. Excuse me? It didn't work for your Crawford. It almost worked. I was one short in Crawford. I think when you say almost, it's the same as saying it didn't. Well, we didn't. We didn't. I could not sell it to a sixth judge. You think you really can sell it to this panel? I think I can, because I'm not relying on the special needs theory. I'm relying on two other theories, one of which, I believe, the consent theory has We'd be reaching out to decide that, because, as you say, there's plenty of reasonable suspicion. We'd have to sort of almost, it would be almost dicta, wouldn't it? Well, I'm only doing this to ensure that if we don't, if you don't find reasonable suspicion, if you're going to find reasonable suspicion and you're telling me that, then I'll just be quiet. No, no, no. In your view, this is a backup argument. Yes, it is. I see. Okay, I understand. But the consent theory has taken on a new luster, if you will, with the Barnett case from the Seventh Circuit. And I can tell you that in that case, the government argued the California, Bravo, Mason, and Zapp theories of consent, and the Seventh Circuit didn't use any of that. They simply went off on a contract theory saying that when you plead guilty and there's an agreement to a search, you've made a contract, and you are stuck with that contract. Of course, the contract here says that you can search with or without probable cause. Reasonable suspicion. It doesn't say anything about reasonable suspicion. No, no, it does say. No, it says reasonable, without reasonable suspicion. Did it? Oh, no, no, no. It says without reasonable suspicion. Without reasonable cause. Reasonable cause. Without reasonable cause. Right. Well, it's, that's a matter of semantics. Where do your lawyers get these terms? Do you sort of sit them down and say, well, you know, we've got probable cause, we've got reasonable suspicion, so I think we'll draft a contract just for fun just to see what the court will do by mixing these terms? Well, I didn't do it. So I'm like, you know, what would happen if you take a llama and you breed it with a zebra, you know? Let's see what happens. Well, I would point out that the condition was written by a probation or by the court. It's a court form, superior court form, and it's the judge who pronounced it. So they call it superior court. Well, but it's not. No one gets English. It's not the lawyers that are doing it. It's the judges that are doing it, that are using the terms. And so if we had it our way, we. As usual, it's the judges to blame, huh? Well, we can't take credit for having devised that theory. And in this particular case, as we point out, the ham was told of this, told of the condition, and he agreed to the condition. It's clear from the sentencing transcript. He never contested it, and furthermore, he wouldn't have walked out the door. Well, if he agreed that if he gets caught with that stuff, he's going to get taken out the back and whipped good. If he is what now? He agreed that if he gets found dirty, if he tests dirty, they're going to take him to the back and they're going to whip him good. They're going to take off his pants and they're just going to. No, he's going to go to jail. Okay. He's going to go to jail. Well, unless he agreed to be whipped. No, he didn't. No, he did not agree to be whipped. Yeah, come on. This context theory has some limits, you know, even in the Seventh Circuit. I would agree. And I wasn't close to Chicago and all that. That's true. And they, in all of the cases, say that the searches cannot be done for harassment or intimidation. And that I would submit. On a racially discriminatory basis, right? Or discriminatory, sure. Or so the police can get paid off for stopping, you know, anything like that, right? Well, they don't. No matter how, what the context says. No, no, no, no. The cases are very, at least the California cases that construe these operations, are very clear as to what is and is not an intimidating or harassment. Judge Posner. Judge Posner. I'll have to have a talk with him. And the final, the final theory we would, we would go on is the, the balancing, the balancing, which is what Knights used. And, and I would submit also the Eleventh Circuit used in Owens v. Kelly, when they talk about compelling interests and the diminished expectation of privacy. It just seems that the, that under the balancing theory that the cases that have ruled on this and have held that you don't need reasonable suspicion, have all said that the expectation of privacy is so reduced that the government's interest in, in supervising the probationers is, is paramount. And so that you don't need reasonable suspicion in that. The most recent case being the, the Utah, the Utah case as well. So I don't have anything else. If the Court has a question, I'll. I have a few questions. Sure. What's your response to opposing counsel's argument that the involvement of the probation officer constituted a violation of the separation of powers clause? Well, if, if you'll recall in the, well, let me, let me address that in two ways. Specifically with regard to this case, is if you'll recall in this case, this probation officer was out there as a probation officer. That was his duty. And it was very clear from the, the transcript that he was there simply to ask compliance questions and to find out if there was a grounds for violation. So in this particular case, he was acting as a probation officer. What about, didn't the record show that he functioned primarily as an investigator, though? No. The record shows he could. That that was one thing. There are times when he did act as an investigator. Well, he, he, he did not supervise this particular, the defendant in this case was not one of his supervisees. Oh, no. No, it was not. Okay. So your, your position is if he, if he's functioned as a, as a probation officer generally, then he's not fulfilling the role of an investigator? No. What I'm saying is, is if you, in, in this being specific now, in this case, is if he, if he were functioning as an investigator, that would be one thing. But in this case, he was not. He was functioning purely as a probation officer. And he would have simply taken the results of his investigation, his probation investigation, and taken it back to the, to the probation office for the institution of proceedings. The, the, the thing that is a little confusing is that he was assigned to this interagency task force. That's right. Not as a probation officer, but as an investigator. No, no. No, I have to, I'm sorry, I have to disagree. He, he wore two hats. He had two hats. He could do both. And in this case, he did not, he did not, was not the investigator. But even if he was, even if he was an investigator, I believe this, the Watt case from this, from this circuit says that that's okay. That that's, that happens. And that the, the, the California statutes are set up to provide for that. And in fact, I would submit that in, in even federal probation officers could function as investigators as well if they, if they were given, given the opportunity to do that. With regard to the questions that he asked while I were, while the search was going on, is it your position that it's not an interrogation or that it's, they weren't in custody or that either both? Well, as far as the probation officer's questioning, as far as the probation officer's questioning, this was a situation where he was, it was not a Miranda-type situation because he was not being interrogated for criminal, for criminal purposes. He was being interrogated for compliance purposes. That's number one. Number two is that he. What were the compliance questions that were asked? Well, they were asking what he was doing. Is, is, what, what are you doing here? What's going on? I mean, they, they have the flavor of an interrogation of asking for incriminating information. But they still, they still are for compliance purposes. Well, one of the, one of the problems was that one of the conditions is that you obey all laws. That's true. So any question you ask about any criminal activity, naturally, because if you print money in the back room, you're violating your probation. That's right. You're also doing some other stuff, violating some other laws, too. So it's pretty open-ended thing, right? He can ask about anything at all. Well, certainly. He can come in and say what have you been up to. And if, if the defendant is willing to give it up, then, then he's, he could be accused of interrogating. If he came in and said we want to talk to you about your counterfeiting activities, which he did not, that, that would be a little more specific. Well, it's specific, but it's also, I mean, you could, he could say what about your counterfeiting activities I'd like to know if you're violating your probation. And then again, and again, the intent, if you, if you read the transcript, this particular probation officer's intent was not to, not to do anything except possibly violate this person's probation. If that's true, then why oppose a motion to suppress the use of those statements in a criminal trial? Well, we, because, because we did not want that to be carried over as a taint to the Secret Service interrogation. We didn't, we didn't need those statements because, because the man confessed. I mean, we didn't need to have a double set of statements here. The man confessed to the Secret Service. And I would point out that in Oregon v. Elstad, which, which admittedly we did not cite in our brief, but which I'm sure this Court is very well aware of, that, that the Court has never, the Court can find that there were statements made in a setting like this that, that do not in any way impinge upon a properly Mirandized statement, which was given later on. Not if it's voluntary. Well, if it's a voluntary statement, that's true. And if anything, the statement in the Secret Service was a voluntary, voluntary statement because this particular individual, when he was told by the Secret Service agents, we, we have to talk about your rights, he said. Well, I'm sorry. I, what I was thinking is that there's no reason that you can't concede that, well, the statement can be suppressed for lack of Miranda warnings, but it was perfectly voluntary. The subsequent statement wasn't. No. I mean, you could say the, the statements made to the probation officer can be suppressed for lack of Miranda warnings. They, they can't be used in a criminal trial. But they were voluntary. We don't concede they were, that they were involuntary. We just concede nobody read them a Miranda warning. And what. Well, I think that's clear. I mean, that didn't happen. But I, but as we argue, we don't believe that Miranda had to be given in, in that particular context. Okay. And, and so the subsequent confession that was purely voluntarily is properly and that's the one that would have been used if, if the matter had gone to trial. Thank you. Sentencing? Is there anything we can? I, I don't know. If, if the Court has any specific questions regarding sentencing, I'm certainly free to address them. You're not arguing that it's, the sentencing issue's moved, are you? Well, Your Honor, we would argue in the alternative, and it's strictly relative to the United States. I mean, wouldn't, couldn't it conceivably affect the remaining term of supervisory? He's still on supervisory. Yes. Yes, he is. And it is possible that it could have some impact. However, we did attempt to distinguish the Verdin case based upon the fact that the term of supervised release. And even if the requested sentence had actually been imposed, which was 18 months, the district court still had the same discretion to impose the same term of supervised release. And here, there's no indication in the record that the district court would in fact impose a different term of supervised release. In fact, the district court went to the maximum term of supervised release given Mr. DeHaan's recidivism and his history. So in that, we would continue to argue that it's moved. But even if, even if, indeed, the court were to address the merits of the case, Mr. DeHaan's admissions at the time of the guilty plea in the first agreement as well as at the time of the sentencing support the adjustments that were made by the district court. What about the counterfeiting adjustment? Well, Your Honor, looking at the specific counterfeiting adjustment, the court went through establishing a base defense level. And where we differed concerning the establishment of the base defense level, the United States argued that the counterfeiting guideline 2B.5.1 should apply. But in the end, the court applied 2B.1.1 under fraud. That started the base defense level at 6. Then the district court went through and began the upward adjustments based on specific defense characteristics. But he's out of jail now, right? So even if this court made a mistake, there's no way to fix it. Correct. So the only thing a remand could do is get him back into more time. Correct. And is the government asking for a remand for that purpose? No, Your Honor, we're not. Well, let's see what the defendant is. If neither the government or the defendant is asking for a remand, then all of these I thought the defense was asking for a remand, but maybe not. This may have been before he got released. Let's find out. I'm sorry. I believe it was before he got released. And when I filed my brief, I believe it was right after Booker. He can't get less time. Not anymore. He can get more time. He's been released since then, and the argument was that his sentence is unreasonable because of the misapplication of the advisory. But it doesn't matter, right? Because he can't get less time. He could theoretically get more time. So I would not think it's an interest to ask for a remand on the sentencing, but it's your call. It's happened before. He cannot get less time. I said it's happened before. I'm about to probably say that and agree with that. But can he get less supervised release? That's the question. Does he have a long leash, as the government says? And if he can get less supervised release, then that is an issue. So you want a remand. You could also get more time. We've discussed that, and I'm aware of that. It's not whether you're back in booker land. You're no longer, you know, and this judge can look at the whole thing and says, you know, I'm going to give him more time. I am going to give him more time. Calculated risk. Your Honor, I think this presents the exact issue. The district court sentenced Mr. Daham to the high end of the guideline range as found by the court at the time. It's quite possible, as Judge Rawson points out, that the district court could sentence Mr. Daham to a higher term, because if anything, the district court felt constrained by the upward limit of the guideline range, not necessarily by the lower limit of the guideline range. So in this instance, it could be a situation where it could get more time. The government said it doesn't want a remand. Maybe we ought to give defense counsel a day or so to think about it and let us know after consulting with a client whether he wants a remand, realizing the risks. Should I do that right now? A day or two. Oh, okay. You've got 48 hours to send us a letter advising us whether or not you're asking for a remand or not. I appreciate it. Thank you. And I guess the final issue is what to do with the supervised release statute. There was a challenge made by Mr. Daham's appeal as to the constitutionality of the supervised release statute. However, Booker plainly states that the supervised release statute is perfectly valid. And with that, we'll submit. Thank you for your time. Thank you. Would you like a minute for a bottle? Or do you think everything that's been said needs to be said? I would like to say a few things. I'm not quite sure it's relevant. You're not going to have time for a few things, but maybe one thing or two. Who chose them? I'm sorry, just one? Who chose the things? Look at the clock. With regard to the statements, Mr. Daham was certainly in custody. I don't believe there can be any way to say he was not in custody as he was grabbed in his garage and taken into his home, handcuffed immediately in his garage and forced to sit on a couch under guard by at least a detective probation officer with at least seven to eight other agents running through his house who found incriminating evidence within five minutes of their being at the house. He was certainly under arrest, and any statements he made would be, in my mind, coerced because it was undisputed. Whether you're right about it or not, he gave a full confession at the station after he got his Miranda warning, so I don't know what goodness does you anyway. Because the coercion is an unlawful extraction of statements, which taints the subsequent statements made three and a half hours later. And again, that is a three part test. Through the Miranda warnings. Through the Miranda warnings. After he gets Miranda warnings, it doesn't wash out the taint. He didn't say very much there anyway. He said enough that was incriminating, and certainly he was in an entire environment that was totally intimidating. There are federal agents, police officers, probation officer wearing bulletproof vests and police on their jackets. They run into the house. If you're on probation, you might suspect that a probation officer would come to your house, knock on the door alone in plain clothes, say, hi, how are you doing? I'd like to come in and talk to you and have coffee and not be handcuffed and forced to sit on the couch. That is completely different. That's what happens when you're on probation and conduct counterfeiting and let other people see it, who then go and snitch on you. That's sort of the consequence. It's an important life lesson. It's a very coercive environment. He was psychologically coerced to talk. He had no idea he couldn't talk. The probation officer said under oath, I think, I thought he had no rights whatsoever. And he acted that way. And so the person who's forced into custody and forced to be handcuffed to his couch thinks, I have no choice. I'm going to talk. You'll write to us in the next 48 hours and let us know whether you want a remand on something like that. Okay. Thank you.  Case is argued. We'll stand submitted. We are adjourned. All rise. Court is adjourned. Thank you. Thank you.
judges: Canby, Kozinski, Rawlinson